# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

KIMBERLY L. IWAN,

        Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,[1]

        Defendant.

No. 17-CV-0097-LRR

**REPORT AND RECOMMENDATION**

————————————————

      Plaintiff Kimberly L. Iwan seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Iwan argues that the ALJ, John E. Sandbothe, erred by failing to consider whether her impairments (including fibromyalgia) equaled Listing 14.09D and that the ALJ did not give good reasons for discounting her subjective complaints, the opinion of her treating physician, or third-party statements. I recommend **affirming** the Commissioner's decision.

---

[1] Nancy Berryhill is no longer the Acting Commissioner of Social Security, although she still leads that agency as the Deputy Commissioner. *See Edwards v. Comm'r of Soc. Sec*, No. 7:17-CV-00052-RN, 2018 WL 1413974, at *1 n.1 (E.D.N.C. Mar. 21, 2018). I substitute the Commissioner of Social Security for Ms. Berryhill in accordance with Federal Rules of Civil Procedure 17(d) and 25(d). *See also, e.g.*, *Gates v. Comm'r, Soc. Sec. Admin.*, 721 F. App'x 575 (8th Cir. 2018) (per curiam); *Stanley v. Comm'r, Soc. Sec. Admin.*, 720 F. App'x 818 (8th Cir. 2018) (per curiam); *Shelton v. Comm'r, Soc. Sec. Admin*, 716 F. App'x 574 (8th Cir. 2018) (per curiam).

# I. BACKGROUND[2]

Prior to 2012, Iwan was steadily employed at various desk jobs. AR 20-21, 211.[3] She began working for a cell phone company in 2009, taking customers' calls and answering questions about their bills, cell phones, and plans. AR 254. She testified that she took a leave of absence in 2011 when she began suffering severe pain. AR 20-21. After Dr. Stanley Mathew diagnosed her with fibromyalgia, she returned to work, but she testified that she was fired within two weeks of her return. AR 21, 254; *see also* AR 452 (third-party letter from Iwan's relative indicates she was fired within "a couple of months" of returning to work). Although she had to miss work a few times due to pain (despite being provided with a standing desk, allowing her to shift positions at will), she testified that her employer ultimately cited misconduct or rudeness as the basis for her termination. AR 21-22. After being fired in August 2012, Iwan did not work until December 2013. AR 19-20, 253. She worked for a temporary-employment agency for a few months, processing life insurance claims, but she was fired after she failed to meet the required quotas. *Id.* She testified that she could not sit or stand for a sufficient period of time to do the work as quickly as required. AR 20.

Iwan filed applications for DI and SSI benefits on June 10, 2014, alleging disability based on fibromyalgia, hypothyroidism, and asthma beginning on August 1, 2012. AR 40-41, 49-50, 83. Iwan's applications were denied initially in August 2014 and upon reconsideration in October 2014. AR 38-79. In connection with those reviews, state agency medical consultants Dr. Tracey Larrison and Dr. Laura Griffith reviewed Iwan's treatment records and issued opinions evaluating Iwan's residual functional capacity (RFC).[4] Dr. Mathew, one of Iwan's treating physicians and a pain specialist, also

---

[2] For a more thorough overview, see the Joint Statement of Facts (Doc. 12).

[3] "AR" refers to the administrative record below, filed at Docs. 9-2 to 9-8.

[4] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

2

provided an RFC opinion, and several of Iwan's friends and family members sent letters regarding her limitations. AR 365-68, 494-97.

The ALJ held a video hearing on May 5, 2016, at which Iwan and a vocational expert testified. AR 14-15. On June 22, 2016, the ALJ issued a written opinion following the familiar five-step process outlined in the regulations[5] to find Iwan was not disabled. AR 83-92. At step one, the ALJ determined that Iwan's work for the temporary-employment agency from December 2013 to March 2014 constituted substantial gainful activity. AR 85. Nevertheless, the ALJ concluded that "there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity," so the ALJ proceeded to step two, with "[t]he remaining findings address[ing] the period(s) the claimant did not engage in substantial gainful activity." AR 86. At step two, the ALJ determined that Iwan suffered from the following severe impairments: fibromyalgia, degenerative disk disease, obesity, and degenerative joint disease of the bilateral knees. AR 86. Although the ALJ recognized that Iwan suffered from asthma, hypothyroidism, and myocardial infarction, the ALJ determined these impairments were not severe. AR 86. At step three, the ALJ determined that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of" a listed impairment. AR 86. The entirety of the ALJ's step-three discussion is included below:

> The claimant's impairments were evaluated singly and in combination under section 1.00[] of the Listings. The medical evidence of record does not contain findings supportive of listing level severity and state agency

---

[5] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

3

> reviewing physicians concluded that the claimant's impairments did not meet or equal any section in the Listing of Impairments.

AR 86. To evaluate whether Iwan's impairments prevented her from performing her past work (at step four), the ALJ determined Iwan's RFC, finding that she could perform sedentary work but "only occasionally balance, stoop, crouch, kneel, crawl, or climb." AR 86. In making this determination, the ALJ outlined the treatment records and assigned partial weight to the RFC opinions of Drs. Larrison and Griffith, little weight to the RFC opinion of Dr. Mathew, and little weight to the third-party letters. Neither did the ALJ find Iwan's symptoms as intense, persistent, or limiting as Iwan had described. AR 90-91. The ALJ found that Iwan could perform her past work and that she was thus not disabled. AR 92.

The Appeals Council denied Iwan's request for review on July 6, 2017 (AR 1-3), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Iwan filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Docs. 1, 3). *See* 20 C.F.R. § 422.210(c). The parties briefed the issues (Docs. 13, 14, 15), and the Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II.    DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of

4

those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Iwan challenges the ALJ's finding at step three, arguing that the ALJ erred by failing to consider whether her impairments equaled Listing 14.09D. Iwan also challenges the ALJ's RFC determination, arguing that the ALJ did not give a good reason for discounting her subjective complaints, Dr. Mathew's RFC opinion, or letters from her friends and family.

### A. Listing 14.09D

During the third step of the disability determination, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "[A claimant's] impairment[] meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3) (citation omitted).[6] A claimant can equal the listings in one of three ways:

> (1)(i) If [the claimant] ha[s] an impairment that is described in [the listings], but—
>> (A) [The claimant] do[es] not exhibit one or more of the findings specified in the particular listing, or
>> (B) [The claimant] exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing,
> (ii) [The Social Security Administration] will find that [the claimant's] impairment is medically equivalent to that listing if [the claimant] ha[s] other findings related to [the] impairment that are at least of equal medical significance to the required criteria.

---

[6] New regulations went into effect on March 27, 2017, and some, by their terms, apply retroactively. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). The Eighth Circuit has applied these new rules retroactively, which are substantively the same as the old rules. *See Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017). I cite to the new 2017 regulations.

> (2) If [the claimant] ha[s] an impairment(s) that is not described in [the listings], [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] impairment(s) is medically equivalent to the analogous listing.
>
> (3) If [the claimant] ha[s] a combination of impairments, no one of which meets a listing, [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairments are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] combination of impairments is medically equivalent to that listing.

20 C.F.R. §§ 404.1526(b), 416.926(b). "To prove that an impairment or combination of impairments equals a listing, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)).[7]

Social Security Ruling (SSR) 12-2p provides guidance on how to evaluate fibromyalgia at step three:

> [Fibromyalgia] cannot meet a listing . . . because [it] is not a listed impairment. At step [three], therefore, [the Social Security Administration] determine[s] whether [fibromyalgia] medically equals a listing (for example, [L]isting 14.09D in the listing for inflammatory arthritis) or whether it medically equals a listing in combination with at least one other . . . impairment.

---

[7] *Sullivan* in turn relied on the following regulatory language: "a claimant's impairment is 'equivalent' to a listed impairment 'if the medical findings are at least equal in severity' to the medical criteria for 'the listed impairment most like [the claimant's] impairment.'" 493 U.S. at 531 (alteration in original) (quoting 20 C.F.R. § 416.926(a) (1989)). The essentials of this regulatory language remain in effect today: "What is medical equivalence? [A claimant's] impairment(s) is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

6

77 Fed. Reg. 43640, 43644 (July 25, 2012). Relying on this, Iwan argues that the ALJ erred at step three in addressing medical equivalence because he did not specifically mention Listing 14.09D. Iwan points to several cases from the District of South Dakota holding that SSR 12-2p requires Listing 14.09D be considered and that remand was necessary because the ALJ provided no analysis, making it "practically impossible for a reviewing court to analyze whether the ALJ's reasoning regarding medical equivalence is sound." *See Wheeler v. Berryhill*, No. 16-5062-JLV, 2017 WL 4271428, at *3-4 (D.S.D. Sept. 26, 2017) (ALJ stated he evaluated all listed impairments, "specifically, 14.02, and does not find requisite medical findings . . . as the record does not reflect that the claimant has severe fatigue, fever, malaise, or involuntary weight loss"); *Schleuning v. Berryhill*, No. 16-5009-JLV, 2017 WL 1102607, at *3-5 (D.S.D. Mar. 23, 2017) (ALJ stated that claimant's impairments did not meet or equal any listing and that "[t]here is no evidence of inability to ambulate effectively as defined in section 1.00B(2)(b) or inability to perform fine and gross movements effectively as defined in section 1.00B(2)(c)"); *Sunderman v. Colvin*, No. 4:16-CV-04003-KES, 2017 WL 473834, at *6-7 (D.S.D. Feb. 3, 2017) (ALJ stated that claimant's impairments did not meet or equal a listing and that he "specifically considered listing 14.06"); *Jockish v. Colvin*, No. 5:15-CV-05011-KES, 2016 WL 1181680, at *6-8 (D.S.D. Mar. 25, 2016) (the ALJ stated that the claimant's impairments did not meet or equal a listing and that he "generally considered [fibromyalgia] under the musculoskeletal listings of 1.00"). In finding that the ALJ's conclusory step-three analysis required remand, all of the relied-upon cases quoted the "practically impossible" language in the previous sentence, which originated with *Miller v. Colvin*, 114 F. Supp. 3d 741, 774-75 (D.S.D. 2015) (holding that remand was required when the ALJ stated generally that claimant's fibromyalgia did not equal any listing but "did not . . . indicate which Listing he considered most closely analogous for purposes of comparison"). *Miller*, in turn, cited *Collins v. Astrue*, 648 F.3d 869, 872 (8th Cir. 2011), which held that the ALJ's failure to support a step-five determination with vocational-expert testimony or reference to the Grids was not harmless, despite the

7

Commissioner's argument that "the Grids would have directed a finding of no disability had the ALJ consulted them." The court found that because "[t]he ALJ was required to follow one of two paths at step five . . . , and there is no record indicating that the ALJ followed either path." *Id.* Thus, *Collins* did not address harmless error in the context of step three.

As the Commissioner notes, the Eighth Circuit has consistently held that "[a]lthough it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion." *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003); *see also Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017); *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822-23 (8th Cir. 2008); *Karlix v. Barnhart*, 457 F.3d 742, 746-47 (8th Cir. 2006). "[R]emand is appropriate [only] where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit [a court] to conclude that substantial evidence supports the Commissioner's decision." *Scott*, 529 F.3d at 822-23 (holding that remand was required when the record contained factual inconsistencies that the ALJ failed to resolve). Thus, even if the ALJ erred in failing to address Listing 14.09D, remand is not required if the record shows Iwan's impairments did not equal that Listing.

Listing 14.09D requires:

Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. pt. 404, subpt. P, app. 1 § 14.09D. Iwan argues that she suffers from marked limitations in activities of daily living and in social functioning. Doc. 13 at 6; AR 264. When determining Iwan's RFC, the ALJ did not include any limitations in social functioning, suggesting he did not find she suffered from marked limitations in that

category. AR 86.[8] This determination is supported by substantial evidence: Iwan reported that she has no problems getting along with people and that she enjoys spending time with her friends at the bar, and Dr. Mathew routinely noted that she was pleasant and cooperative. AR 26, 225-27, 476-92, 501-05. The ALJ's RFC discussion also supports that he did not find Iwan markedly limited in her activities of daily living: the ALJ found that Iwan prepares meals, does yard work and housework, shops, drives, and goes to bars with friends, which the ALJ found demonstrated Iwan was not as limited "as one would expect[] given [her] complaints of disabling symptoms and limitations." AR 91. In sum, the record supports the overall conclusion that Iwan's impairments do not medically equal Listing 14.09D's requirement that the claimant suffer from a marked limitation in activities of daily living, social functioning, or concentration, persistence, or pace. *See Johnson v. Colvin*, No. 4:14CV3146, 2015 WL 5008642, at *10-11 (D. Neb. Aug. 20, 2015) (relying in part on the ALJ's RFC determination to find that the claimant suffered from no marked limitations in social functioning, activities of daily living, or concentration, persistence, or pace, and holding that the record did not support that the claimant's impairments medically equaled listing 14.09D). Although it would most certainly make review easier had the ALJ provided actual reasoning and explanation in his decision, any error by the ALJ in failing to address Listing 14.09D was harmless.

### B. Weight to Subjective Complaints

When evaluating the weight to assign a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Black v. Apfel*, 143 F.3d 383, 386

---

[8] Neither did the ALJ include any limitations related to concentration, persistence, or pace. AR 86.

(8th Cir. 1998); *accord Polaski*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*,[9] 804 F.2d 456 (8th Cir. 1986). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." *Black*, 143 F.3d at 386. The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary," *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993). Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'" *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (quoting *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001)). "The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004).[10]

---

[9] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. *Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

[10] Iwan argues that "the Eighth Circuit's relaxed approach at review of credibility determinations" is outdated, as the Social Security Administration recently replaced SSR 96-7p, 61 Fed. Reg. 34483 (July 2, 1996), with SSR 16-3p, 81 Fed. Reg. 14166 (Mar. 16, 2016). Doc. 13 at 10-14. As district courts in the Eighth Circuit have noted:

> Both SSR 96-7p and SSR 16-3p direct that evaluation of a claimant's subjective symptoms shall consider all evidence in the record. Both Rulings also incorporate the regulations . . . that identify factors to be considered . . . . But while SSR 96-7p expressly provided that a credibility finding was required to be made under those regulations, SSR 16-3p expressly provides that use of the term "credibility" was being eliminated because the [Social Security Administration] regulations did not use it.

*Hayes v. Berryhill*, No. 15-5253, 2017 WL 690556, at *3 (W.D. Ark. Feb. 21, 2017) (quoting *Martsolf v. Colvin*, No. 6:16-cv-00348-NKL, 2017 WL 77424, at *5 (W.D. Mo. Jan. 9, 2017)). Iwan points to language in SSR 96-7p requiring that the ALJ discuss "the factors pertinent to the evidence of record," but this language does not require that every *Polaski* factor be thoroughly analyzed, as Iwan suggests. As will be discussed, the ALJ's evaluation of Iwan's RFC adequately considers all the evidence in the record (as required).

10

At the hearing in May 2016, Iwan testified that driving for long distances causes pain, so recently, she has not been driving very often (she admitted, however, to driving forty minutes to appear at the hearing). AR 18. She testified that she cannot sit for any length of time and indicated that she was uncomfortable sitting to testify. AR 31. With regard to her ability to walk, she said that she can only walk for twenty minutes at a time without her back giving out and that when grocery shopping, she must lean on the cart or use a motorized cart. AR 24. She testified that in the past year, her ability to do chores has decreased, and she can no longer stand long enough to cook anything other than frozen or microwave meals. AR 25-26. She testified that she constantly feels pain in her lower back, hips, thighs; that she feels like she will break if someone touches or hugs her; and that sometimes, it feels like she is walking on needles due to pain in her feet. AR 23. She testified that she suffers from migraines, poor sleep, fatigue, irritability, near-daily irritable bowel syndrome, and problems with memory and concentration. AR 23-24, 27-31.

The ALJ found that Iwan's subjective complaints were inconsistent with her activities of daily living. AR 91. In July 2014, Iwan reported going to the bars two to three times a week to spend time with friends and to play pool. AR 225. She reported that she is "not able to dance much now" and that she could not stand to talk very long before she needed to sit down, however. AR 226. At the time of her hearing in May 2016, she reported only going to the bars once or twice a month and "sitting there socializing," but not dancing. AR 26. The ALJ also noted that a treatment note from February 2016 indicated that Iwan had been bowling, although she had fallen while doing so, resulting in pain in her leg. AR 396. Iwan also reported in her July 2014 function report that she could mow the lawn using a riding lawn mower, do laundry, perform small household repairs, and clean, and she stated that she went shopping in stores once a week for one to two hours. AR 223-24. Iwan also stated that she could prepare multi-course meals, but only if she made things in stages throughout the day and sat down while chopping and peeling. AR 223. In August 2015, she told a provider that she is "active

11

with light household chores including cooking," although she has assistance from her boyfriend at times. AR 452. Here, the ALJ could find that Iwan's minimal limits in her activities of daily living were inconsistent with her allegations of disabling pain. *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005); *see also Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, . . . washing dishes, doing laundry, shopping, driving, and walking[] are inconsistent with subjective complaints of disabling pain."); *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (household chores such as cooking, laundry, and vacuuming, and participating in activities causing "calloused and greasy" hands were inconsistent with claims of disabling pain).

The ALJ also outlined the treatment records and concluded that the medical findings did not support limitations as great as Iwan alleged. AR 87. Despite Iwan's reports of migraines in her function report in July 2014 and at the hearing in May 2016, treatment records reflect that Iwan only once complained of migraines (in July 2013), which she reported suffering as a side effect to Lyrica (which was discontinued). AR 23-24, 221, 315. She never complained of irritable bowel syndrome to her providers and denied any bladder or bowel problems in August 2011, December 2012, December 2013, and September 2015. AR 297, 323, 351, 387. Although she was prescribed medication to help her sleep (AR 315), and she occasionally reported suffering poor sleep or fatigue (AR 385, 388, 390, 393, 436, 441-42), she just as often denied such symptoms (AR 297, 305, 351, 390, 393, 395-96, 398). Treatment records do not reflect that Iwan complained of problems with irritability or depression,[11] and providers routinely noted Iwan's normal mood and affect. AR 349, 353, 377, 379-80, 383, 385, 390-91, 395, 397, 399, 422, 426, 458; *see also* AR 493, 501-02, 504-05 (Dr. Mathew's treatment notes reflect Iwan was "pleasant and cooperative"). Although Iwan testified to limitations related to memory and concentration, the ALJ noted that she stated her impairments did not affect

---

[11] Iwan did report to Dr. Mathew at her first appointment in January 2015 that she did "not feel she c[ould] work due to severe pain and depression." AR 475.

her ability to concentrate in her function report in July 2014. AR 91, 226. Iwan also denied decreased concentration when asked by providers in November 2015 and January and February 2016 (AR 390, 394, 396), and she denied "foggy memory" in December 2012 (AR 297). Substantial evidence supports that Iwan's complaints of migraines, poor sleep, fatigue, irritability, decreased memory and concentration, and irritable bowel syndrome are inconsistent with the treatment records and other evidence in the record.

With regard to her pain and resulting functional limitations, Iwan argues that the ALJ ignored the reality of fibromyalgia causing good days and bad days. The ALJ could find, however, that the treatment records as a whole support that most of the time, Iwan was not as limited as she claimed (she testified to constant pain and limitations). Iwan suffered a flare in pain in the summer of 2011, which resulted in her taking a leave of absence from work. AR 278-80, 323. By mid-October 2011 (and through June 2012), however, when Iwan sought treatment for other ailments, she did not report back or other pain. AR 329-46. In August 2012 (Iwan's disability onset date), Iwan lost her job and was diagnosed with fibromyalgia. In December 2012, at an appointment to establish care with a primary care provider, she reported suffering from fibromyalgia, which caused pain, as well as other ailments, and the provider prescribed medications and recommended "exercise including aqua-therapy." AR 297-300. When Iwan next saw the provider in April 2013, she reported that her fibromyalgia was "better" on medications but that she "still ha[s] good and bad days with" the pain in her back, and she requested a handicap sticker, which the provider declined to give her because her "treatment involves increasing physical activity." AR 303. Iwan went to the emergency room in July 2013 and reported suffering a flare in fibromyalgia pain in her hips, and doctors recommended she "initiate an exercise program" and participate in physical therapy and aquatherapy. AR 315, 319-20. She again went to the emergency room in October 2013 with a flare in back pain, which happened when she was "moving belongings at home." AR 348-49. In December 2013, she reported muscle pain (but denied back pain) when she sought treatment for bronchitis. AR 351. Iwan worked at

13

the substantial-gainful-activity level from December 2013 to March 2014, and from the treatment notes in the record, it does not appear Iwan sought any treatment from December 2013 until October 2014 (right after her disability claim was denied). At her yearly physical with her primary care provider in October 2014, she reported "no problems" but requested a referral to Dr. Mathew for pain control, and during the review of systems, she reported suffering pain in her daily life due to "a history of fibromyalgia." AR 373. Before she could reestablish care with Dr. Mathew, she presented to the emergency room complaining of increased back and hip pain (she was out of medications), and she followed up with her primary care provider to have her prescriptions refilled. AR 376, 420. She denied any musculoskeletal complaints in December 2014, however, when seeking treatment for shortness of breath. AR 424; *see also* AR 378-79 (treatment notes reflect Iwan denied musculoskeletal complaints during the review of systems, although the purpose of the appointment was to increase her pain medication dosage due to "increased pain").

At Iwan's appointment with Dr. Mathew in January 2015, she reported suffering from chronic pain, primarily in her low back, that was aggravated with activity and better with rest. AR 475. At Dr. Mathew's referral, Iwan participated in physical therapy and aquatherapy from January to March 2015. AR 428-49. At these appointments, she generally reported feeling sore (from land physical therapy and changes in weather) and benefitting from aquatherapy (but not land physical therapy). *See id.*; *see also* AR 381. She also reported pain in her knees during these physical therapy sessions. AR 428, 432, 434, 437, 441-41, 445, 447, 449. From March to the end of 2015, treatment records reflect Iwan primarily complained of knee pain, which was improved by a series of injections performed by Dr. Mathew (the injections also improved her functional abilities). AR 452, 477-92. Although treatment records reflect that Iwan continued to complain of fibromyalgia pain, providers also noted (as emphasized by the ALJ) that Iwan was "doing fairly well from [a] pain standpoint," that her medications "work[ed] well," that she voiced "no concerns," and that her fibromyalgia pain was stable or

14

controlled. AR 383-92, 477-78. Iwan's primary care provider continued Iwan on the same prescriptions, and she recommended Iwan exercise for thirty minutes a day, five days a week. AR 383-92.

On January 1, 2016, Iwan went to the emergency room complaining of back pain from a fibromyalgia flare lasting a few days. AR 456-62. She reported that it had been "awhile, maybe a few months" since the last flare. AR 456. By mid-January 2016, a provider noted that her fibromyalgia pain was stable. AR 393. She suffered another fibromyalgia pain flare in February 2016 and went to the emergency room. AR 460-62. She also complained of pain in her thigh at appointments in February and March 2016, which she said started after she fell and slid on ice. AR 396-98. She also reported continuing to suffer pain in her left knee and requested another round of injections. AR 492. Dr. Mathew began a second round of left-knee injections in April 2016, which Iwan reported improved her pain. AR 501-05.

The treatment records provide further support that Iwan did not suffer from constant severe fibromyalgia pain, as alleged. Although the treatment records demonstrate that Iwan suffers pain and resulting limitations, substantial evidence supports the ALJ's decision not to fully credit all of Iwan's subjective complaints.

### C. Dr. Mathew's RFC Opinion

When determining a claimant's RFC, the ALJ considers "medical opinions . . . together with the rest of the relevant evidence." 20 C.F.R. §§ 404.1527(b), 416.927(b). "The ALJ must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "Although a treating physician's opinion is usually entitled to great weight, it 'do[es] not automatically control, since the record must be evaluated as a whole.'" *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir.

15

2016) (alteration in original) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." *Id.* The ALJ considers the following factors to determine the weight to assign a medical opinion:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current 20 C.F.R. §§ 404.1527(c), 416.927(c)).

Dr. Mathew, Iwan's treating pain specialist, filled out a Medical Source Statement (MSS) form in January 2015 evaluating Iwan's RFC. AR 365-68. He noted her diagnosis of fibromyalgia and chronic pain, which caused symptoms of severe pain, low endurance, fatigue, and weakness, as well as low mood. AR 365, 368. When asked whether Iwan's medications cause side effects, Dr. Mathew wrote side effects include dizziness, drowsiness, and memory deficits. AR 365. He circled answers indicating that Iwan could only sit, stand, and walk for one hour at a time and elaborated (in response to a question) that she would need to alternate positions every twenty minutes. AR 365. He also checked boxes indicating that Iwan could lift ten pounds occasionally, but never more than that; that she could never squat, crawl, or climb; that she could not be around unprotected heights or machinery (it appears he originally checked that she had no limitations in these categories, scribbled it out, and then marked that she suffered total limitations); and that she had some limitations in her ability to be around temperature changes and dust. AR 366-67. Finally, Dr. Mathew checked a box indicating that Iwan would need to take unscheduled breaks in an eight-hour day, explaining that she suffers "exacerbations of pain [one to two times a month, at which times she] will require rest break[s]" one to three times a month. AR 367.

16

The ALJ noted that Dr. Mathew's MSS form indicated Iwan was extremely limited. AR 88. The ALJ stated that "courts have long recognized[] form reports in which the source's only obligation is to fill in a blank or check off a box are entitled to little weight in the adjudicative process" and therefore assigned little weight to Dr. Mathew's opinion. AR 88-89. As Iwan argues, an ALJ may not "discount an [RFC opinion on an MSS form] on the basis that the 'evaluation by box category' is deficient *ipso facto*." *Reed v. Barnhart*, 399 F.3d 917, 921-22 (8th Cir. 2005) (holding that the ALJ did not give good reasons for discounting the treating source's RFC opinion contained on an MSS form when the ALJ assigned the opinion little weight because "evaluation by box" is categorically deficient; in addition, the ALJ found the limitations on the form inconsistent with and unsupported by the treatment records, but the court held this finding was not supported by substantial evidence); *see also Cline v. Colvin*, 771 F.3d 1098, 1104 (8th Cir. 2014) ("[A] checklist evaluation can be a source of objective medical evidence . . . .").[12] But an ALJ may "discount a treating physician's

_____

[12] *Cf. Tippe v. Colvin*, 669 F. App'x 332, 334-35 (8th Cir. 2016) (per curiam) (upholding ALJ's reasons for discounting treating-source opinion contained on a checklist MSS form when the ALJ noted checklist forms are entitled to less weight but also cited the source's failure to take the claimant's noncompliance into account); *Toland v. Colvin*, 761 F.3d 931, 935-37 (8th Cir. 2014) (upholding ALJ's reason for discounting treating-source opinion when the ALJ found the "evaluation in the MSS . . . unsupported by [the claimant's] medical records, daily activities, and work history"); *Anderson v. Astrue*, 696 F.3d 790, 793-94 (8th Cir. 2012) (rejecting claimant's argument that the ALJ "incorrectly applied the law by summarily rejecting [the treating source's] evaluation because it appeared on a pre-printed, checkbox form" when, in addition to finding the form "conclusory," the ALJ also found the limitations on the form inconsistent with the treatment records); *Teague v. Astrue*, 638 F.3d 611, 615-16 (8th Cir. 2011) (upholding ALJ's reasons for discounting treating-source opinion when the ALJ found the treating source's checklist MSS form cited no "clinical test results or findings" and contained limitations inconsistent with the source's treatment records); *Wildman v. Astrue*, 596 F.3d 959, 964-66 (8th Cir. 2010) (upholding ALJ's reasons for discounting treating-source opinion when the ALJ noted the opinion was contained on a checklist MSS form and did not address the claimant's noncompliance); *Cain v. Barnhart*, 197 F. App'x 531, 533-34 (8th Cir. 2006) (per curiam) (upholding ALJ's reason for discounting the limitations contained on a treating source's MSS form when the ALJ also noted the limitations were inconsistent with other medical evidence); *Holmstrom v. Massanari*, 270 F.3d 715, 720-21 (8th Cir. 2001) (same); *but see Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) (after suggesting that the provider may

17

MSS where the limitations listed on the form 'stand alone,' and were 'never mentioned in [the physician's] numerous records or treatment' nor supported by 'any objective testing or reasoning.'" *Id.* at 921 (alteration in original) (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)). Here, although the ALJ did not explicitly state that he found the limitations contained in Dr. Mathew's opinion to "stand alone" without support from his treatment records, the ALJ outlined the treatment records (including Dr. Mathew's) to determine Iwan's RFC and concluded that "the medical findings do not support the existence of limitations greater than the above listed [RFC]." AR 87-90. Thus, I will determine whether the limitations on Dr. Mathew's form stand alone, or whether the basis for his opinion is evident from his treatment records or the record as a whole. *See Hamman v. Berryhill*, 680 F. App'x 493, 494-95 (8th Cir. 2017) (per curiam) (holding that when the ALJ discounted a treating provider's physical RFC opinion contained on a checklist form because it was "unexplained, unsupported by reference to any positive medical findings, and suggested that psychosocial circumstances were a major factor in the assessment," the ALJ "did not err . . . , particularly given the other substantial evidence in the record supporting the ALJ's [RFC] assessment" (internal quotation marks omitted)).

It is unclear when Dr. Mathew first saw Iwan, but she testified that he diagnosed her with fibromyalgia in August 2012. AR 21, 297, 494. The extent of Dr. Mathew's treatment of Iwan at this time is unknown, as those treatment notes are not in the record, but in October 2014, Iwan indicated that she had not seen Dr. Mathew for two years and requested a referral "back" to Dr. Mathew. AR 373-74, 420. Iwan's first appointment

---

not have been a treating source, despite the claimant's argument otherwise, the court noted the provider's RFC opinion consisted of "checked boxes, circled answers, and brief fill-in-the-blank responses"; "cite[d] no medical evidence[;] and provide[d] little to no elaboration"; and "on that basis alone, the ALJ did not err in giving [the opinion] little weight"; the court went on to note that the ALJ also found the opinion inconsistent with the record as a whole, which was supported by substantial evidence).

with Dr. Mathew after this gap in treatment was on January 7, 2015, which is also the date Dr. Mathew filled out the MSS form evaluating Iwan's RFC. AR 365-68, 475. At this appointment, Iwan reported that she suffered chronic pain, primarily in her back; that her pain was aggravated with activity; that she had tried multiple injections with no relief; and that she could not work due to pain and depression. AR 475. Iwan's report of depression is perhaps why Dr. Mathew's MSS form indicates she suffers from "low mood," despite all of his treatment notes (including the notes from the January 7 appointment) indicating Iwan was pleasant and cooperative. AR 476-92, 501-05. No other treatment notes in the record reflect that Iwan ever complained of depression; indeed, Iwan routinely denied psychological problems and was found to have a normal mood and affect. AR 286, 318, 349, 353, 375-85, 390-91, 395, 397, 399, 422, 426, 457-58, 462.

Dr. Mathew also opined that Iwan's symptoms would frequently be severe enough to interfere with her attention and concentration. AR 365. None of Dr. Mathew's treatment notes reflect such complaints, and as noted in the preceding section, treatment notes from other providers reflect Iwan denied any problems with concentration. AR 297, 390, 394, 396; *see also* AR 226, 238-39 (Iwan denied trouble concentrating in July 2014 function report but reported trouble concentrating in September 2014 pain questionnaire). Neither do Dr. Mathew's treatment notes (or other records) reflect any complaints of side effects of dizziness or drowsiness from medications. It is also unclear how Dr. Mathew arrived at his conclusions related to Iwan's ability to work around heights, machinery, temperature, and fumes.

Dr. Mathew also noted that Iwan's pain is exacerbated one to three times a month and that during those times, she would need to take unscheduled breaks. AR 367. Dr. Mathew's treatment notes do not reflect any reports of pain flares related to fibromyalgia (most of Dr. Mathew's treatment notes reflect treatment to Iwan's knees, a problem Iwan did not begin complaining about until after Dr. Mathew filled out his MMS form). As outlined in the preceding section, other evidence in the record demonstrates that Iwan

19

suffers from pain flares due to her fibromyalgia, but not to the extent found by Dr. Mathew. From August to October 2011 (while Iwan was still employed, although she took a leave of absence), Iwan suffered increased pain and reported the last such "flare-up" had been in March 2010. AR 278-80, 323-29. In April 2013, she reported suffering "good and bad days with pain worse in her lower back." AR 303. In October 2013, she went to the emergency room complaining of severe back pain, which improved upon receiving an injection of morphine. AR 348-50. She also reported a three-day fibromyalgia flare in January 2016 (and noted that her last such flare had "maybe" been "a few months" ago) and again in February 2016. AR 456, 460.

It is unclear from Dr. Mathew's treatment records, as well as other evidence in the record, how Dr. Mathew arrived at many of the limitations in his RFC opinion. Therefore, the ALJ did not err in assigning little weight to the limitations contained on Dr. Mathew's MSS form.

### D. Third-Party Letters

Iwan submitted three letters from April 2016 that were written by her daughter and son-in-law, whom she lived with from at least July 2011 to August 2012, and by her boyfriend, whom she began living with around April 2014. AR 494-95. Her daughter reported that Iwan is an "unhappy, depressed individual who can't do the smallest things such as walking through a mall . . . or babysitting her grandkids." AR 494. She further reported that Iwan cannot walk, stand, or sit for any length of time without suffering "extreme" back pain. *Id.* Iwan's son-in-law described Iwan's inability to clean, do laundry, and cook when she was first diagnosed, and he reported that Iwan currently lives "in constant pain," takes medications "round the clock just to be able to function," is "unable to do anything for an extended period of time," and is depressed. AR 495. Iwan's boyfriend wrote that Iwan has progressively gotten less sleep due to pain and that he "now ha[s] to vacuum the house and carry the laundry and groceries to and from the car to the house, since she is not able to." AR 496-97. The ALJ noted (using boilerplate

20

language) that he assigned the third-party statements little weight because Iwan's family members are not "disinterested third parties," and their statements were "not consistent with the preponderance of the opinions and observations by medical doctors." AR 91.

When determining the weight to assign a statement from a nonmedical source, the ALJ considers the same factors as with medical opinions. SSR 06-03p, 71 Fed. Reg. 45593, 45594-45596 (Aug. 9, 2006); *see also* 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1) (regulations that went into effect in March 2017 codifying SSR 06-03p). The ALJ should explain the weight given to third-party statements or "otherwise ensure that the discussion of the evidence in the . . . decision" explains the ALJ's reasoning. SSR 06-03p, 71 Fed. Reg. at 45596; *accord* 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2). Here, Iwan argues that the ALJ's use of boilerplate language when discussing the weight to afford Iwan's loved ones' statements requires reversal. But the ALJ's discussion of Iwan's RFC must be considered as a whole, and in addition to the paragraph of boilerplate language, the ALJ outlined the treatment records and other evidence of record. AR 87-90. As discussed in the preceding sections, the treatment records do not reflect that Iwan ever reported being depressed (or that providers observed anything other than a normal mood and affect). Iwan's activities of daily living (reflected in her function reports, the treatment notes, and her testimony) are inconsistent with an inability to walk or sit for "any length of time." Although I am concerned by the ALJ's use of boilerplate language, in this case, the ALJ did not err in assigning the third-party statements little weight.

### III.    CONCLUSION

I recommend that the district court **affirm** the decision of the Social Security Administration and enter judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.

21

Fed. R. Civ. P. 72.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.  *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **ENTERED** this 12th day of July, 2018.


Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa